DAVID McPHERSON, Respondent, *v.* CHARLES Cox et al., Owners, etc., Appellants.

An agent or attorney unless specially authorized cannot bind his principal by a submission to arbitration.

Plaintiff chartered defendant's vessel for a voyage from Charleston to Liverpool or Havre, for a sum named; bills of lading were to be signed by the master but without prejudice to the charter. It was agreed that any difference between the bills of lading and the charter-party was to be settled at Charleston before the vessel sailed, in accordance with the rates of freight, weight, etc., expressed in the bills of lading, if in the charterer's favor, " by the captain's bill, payable ten days after arrival at the port of discharge." Plaintiff furnished a cargo of cotton consigned to Liverpool. By the custom at that port, which was well known to plaintiff and the master, freight is only collectible on net weight of cotton. Plaintiff calculated the freight upon the gross weight of the cotton covered by the bills of lading, and after the vessel was laden ready for sea he demanded of the master a bill of exchange for the difference; the latter objected on the ground that the tare should be allowed. Plaintiff was agent for the owners of the vessel and he alone could get clearance for her at the custom-house; he refused to clear and allow her to proceed unless the master would sign the bill and an agreement that the question in dispute should abide the decision of the " United States Court at Charleston " in a case then pending. The captain thereupon signed. In an action upon the bill so given, *held,* that the charter-party contemplated the bills of lading should be resorted to in the first instance as a means of payment to the ship-owners, and plaintiff was entitled to credit for no more than they actually represented ; *i. e.,* the amount collectible thereon ; that in the absence of words of exclusion in the charter-party it should be held to have been framed in reference to the usage, which should, therefore, have been taken into consideration in estimating the amount due on the bills of lading ; and that defendants were not concluded by the bill or the agreement : 1st. As the bill was not delivered in final settlement of the claim but under an agreement in effect, an arbitration, which the captain as agent for the

owners had no authority to make ; 2d. Because the unlawful refusal of plaintiff to allow the vessel to leave the port until the bill was signed constituted duress.

*It seems* that it is not duress for a person to insist on his legal rights.

*McPherson* v. *Cox* (21 Hun, 493), reversed.

(Argued October 7, 1881 ; decided October 25, 1881.)

APPEAL from judgment of the General Term of the Supreme Court, in the first judicial department, affirming a judgment in favor of plaintiff, entered upon a verdict. (Reported below, 21 Hun, 493.)

This action was brought upon a bill of exchange executed by the master of defendants' vessel, which had been chartered by plaintiff for a voyage from Charleston, S. C., to Liverpool or Havre, and upon a cotemporaneous agreement between plaintiff and the master.

The material portions of the charter-party are as follows :

" This charter-party, made and concluded upon, in the city of New York, the 19th day of October, 1875, between Perkins & Job, agents of the bark ' Charles Cox,' of Nova Scotia, of the burden of 677 tons, or thereabouts, register measurement, now lying in the harbor of Sydney, C. B., of the first part, and D. McPherson, Esq., of Charleston, by his agent, John A. Janssen, at New York, of the second part, witnesseth that the said party of the first part agrees on the freighting and chartering of the whole of said vessel (with the exception of the cabin and necessary room for the crew and storage of provisions, sails and cables) unto the said party of the second part, for a voyage from Charleston, S. C., to a direct port, either Liverpool or Havre."

" The said party of the second part doth engage to provide and furnish to the said vessel a full cargo of cotton in square bales, or bags, or other lawful merchandise, phosphate to be shipped for ballast only. Charterer to pay all vessel's loading expenses, employing his stevedore and compressing at his expense, not including vessel's regular port charges, and to pay to said party of the first part, or agent, for the use of said vessel during the voyage aforesaid, (£1,350) thirteen

hundred and fifty pounds sterling, if ordered to a direct port in Great Britain or Havre. Bills of lading to be signed without prejudice to this charter, any difference between bills of lading and charter-party to be settled at Charleston before vessel sails, in accordance with the rates of freight and weight, gauge or measurement expressed in bills of lading ; if in vessel's favor, to be paid in cash at the current rate of exchange, less insurance ; if in charterer's favor, by captain's bill, payable ten days after arrival at port of discharge."

The agreement executed at the same time as the bill of exchange is as follows :

"CHARLESTON, S. C., *Dec.* 31, 1875.

The undersigned parties to this agreement hereby bind themselves to abide the decision of the United States court at Charleston, in the case of the Barkentine 'Kioto,' as regards the settlement of the freight clause of ' Any difference between charter-party and bills of lading to be settled at Charleston before vessel sails, in accordance with rates of freight and *weights expressed in bills of lading.*' Whatever said decision may be in that case to apply to the British bark ' Charles Cox,' and if the tare and allowances in England are allowed thereon, the undersigned charterer binds himself to remit the same to Messrs. Perkins & Job, New York, immediately after the same is promulgated.

(Signed)                 E. B. GOUDY,
                              *Master of ' Charles Cox.'*

(Signed)                 D. McPHERSON,
                                        *Charterer."*

The further material facts are stated in the opinion.

*Joseph A. Shoudy* for appellants. The master of a ship has no more authority to bind his owners than any other agent has to bind his principal. (*Pope* v. *Nickerson,* 3 Story, 465–475 ; 2 Pars. on Ship. and Adm. 7, note 2.) He is not even the general agent of the owners. (*Melchison* v. *Oliver,* 5 Ell. & B. 419 ; 32 Eng. Law & Eq. 219, 232 ; 2 Pars. on Ship. 10.) He cannot make a charter-party which shall bind his owners with-

out express authority. (2 Pars. on Ship. 13; *Burgon* v. *Sharp*, 2 Campb. 529; Abb. on Ship. 106; *Naylor* v. *Baltzell*, Taney, 56; *Merritt* v. *Walsh*, 32 N. Y. 685; *Donnell* v. *Walsh*, 33 id. 42, 45.) Fraud does not constitute any element of duress. (*Harmony* v. *Bingham*, 12 N. Y. 90; *Baldwin* v. *Liverpool & G. W. S. S. Co.*, 11 Hun, 496; S. C., 74 N. Y. 125, 128; *Briggs* v. *Boyd*, 56 id. 289; *Scholey* v. *Mumford*, 60 id. 498; *Bates* v. *N. Y. Ins. Co.*, 3 Johns. Cas. 238.) If full force be given to both the bill and the agreement as legal instruments, they do not bind the defendants personally. (*Harbor* v. *Brotherstone*, Campb. 254; *Huntley* v. *Sanderson*, 1 C. & M. 467.) The effect of the bill was to bind the ship and her earnings, and not to bind the owners personally. *The Rebecca*, 1 Ware, 187; *The Larch*, 3 id. 31.)

*Wm. W. Goodrich* for respondent. The master is agent for the ship with full power to charter or to act as the agent of the owners. (1 Pars. Mar. Law, 381; Desty's Shipping and Admiralty, §§ 115, 116; *Alexander* v. *Dowie*, 37 Eng. L. & E. 549; *Wallace* v. *Kelsall*, 7 M. & W. 264.) It is not duress on the part of a person to insist upon his legal rights. (*Knapp* v. *Hyde*, 60 Barb. 80; *Elliott* v. *Swartout*, 10 Pet. [U. S.] 154; *Bresbain* v. *Dacres*, 5 Taunt. 154.)

Danforth, J. The plaintiff chartered the whole vessel for a voyage from Charleston to the port of Liverpool or Havre, at his option. He was to pay for the use of the vessel the lump sum of £1,350 sterling, and as charterer was entitled to the freight earned by the vessel. These things appear among the provisions of the charter-party, and neither of them is dependent upon the other. Bills of lading were, according to custom, to be signed by the master, but it is expressly stated that this should be without prejudice to the charter, and the manifest effect of the provision is, that the owner's right to recover of the charterer the sum stipulated for in the charter-party is unaffected by the amount of freight named in the bills of lading. It would seem, therefore, as the vessel was to be

employed by the charterer for his own profit, and was to be
paid for by him without regard to the freight earned, that the
master, in signing the bills of lading, would do so as the agent
of the charterer, and not of the owner.   The charter-party,
however, contemplates that the bills of lading should be re-
sorted to in the first instance as a means of payment to the
ship-owner, for it provides that "any difference between bills
of lading and charter-party to be settled at Charleston before
the vessel sails, in accordance with the rates of freight and
weight, gauge or measurement, expressed in bills of lading."
Thus the time and place, and certain elements of adjustment,
are fixed, and so also is the mode of payment for such differ-
ence as may be found, viz. : in cash, if it was found to be in
favor of the vessel, and, "if in the charterer's favor, by the
captain's bill, payable ten days after arrival at port of dis-
charge." The charterer furnished freight to the vessel, and, as
he now alleges, received from its master the bill or obligation
on which this action is brought, as for the difference found
due to him upon settlement under these provisions.   The bill
was for £627 2s. 7d. ; at its maturity, the sum of £543 7s. 7d.
was paid, and the residue being denied, the bill went to protest
The ground of this payment of part, and refusal of the bal-
ance, was that the sum paid was all that was due and collectible
upon the bills of lading beyond the £1,350 due by the terms of
the charter-party from the charterer, to the owners.   There
is no doubt of the truth of this contention, but the question
is whether it is available to the defendants.   The bill was ob-
tained from the captain upon the assumption by the plaintiff
that the vessel was chargeable upon the gross weight of freight
covered by the bills of lading.   It was, however, well known,
both to the charterer and the master, that ·by the custom or
usage of the port of Liverpool, freight was collectible only on
net weight of cotton delivered, and the master insisted that
this usage should be taken into account in estimating the
amount due on the bills of lading.   In this the master was
right.   There are no words of exclusion in the charter-party,
and, in their absence, it should be held to have been framed in

reference to this usage. (*Hudson* v. *Ede*, L. R., 2 Q. B. 566; 3 id. 412.)   The essential term of the agreement was that the owners of the vessel should receive the full sum of £1,350. This was to be subject to no abatement or diminution, nor was it made to depend in any way upon the receipt for freight or the sum collected.   It was to be paid by the charterer, and the bills of lading were only a means of procuring payment.  He was entitled to credit for no more than they actually represented. This was determined in part by the usage of the port where the cargo was to be delivered; and as this was known at Charleston, it could be taken into account there.   Nor are the defendants concluded by the bill or the agreement acccompanying it from the defense arising upon this error.   First.  The bill was not delivered in final settlement of the claims arising under the charter-party and bills of lading.   On the contrary, the conditions of that settlement are expressed in the agreement.   It is there declared that the parties shall abide the decision of the United States court at Charleston, in the case of the Barkentine Kioto, in regard to the interpretation of the clause in question.   This submission, we think, was not within the authority of the master.   In effect, it was an arbitration.   It substituted for the contract of the charter-party one made by the master.   By the charter the settlement must be by the master, as representing the vessel and having in his hands that instrument and the bills of lading. If, by reason of disagreement between himself and the charterer, that could not be done, the charterer should have been remitted to the ordinary proceedings in court, or the master should have consulted the agents, who on behalf of the owners made the charter-party.   The captain's duty was with the ship and cargo. To determine upon arbitration, or whether the ordinary course of legal action should be dispensed with, in enforcing the vessel's claim against the charterer, had no relation to that duty.   As agent his powers were limited, and in respect to the matter in question, involved his personal judgment and decision.   He could not delegate this power to determine, or deprive the owners of the right to have the controversy adjusted by the courts.   Yet this is what he undertook to do.   It was not

within the scope of his authority and cannot avail the plaintiff. An attorney at law cannot bind his client by a submission to arbitration. An agent would not have this power unless received specially from his principal. It is also apparent that there should have been no controversy to submit. The custom of the port of Liverpool to deduct for tare, etc., four *per cent* was, as we have seen, established. Upon the plaintiff's own evidence such custom was acknowledged in Charleston, and the allowance made in that city upon a cargo of cotton to be carried from Charleston to Liverpool. It is true the plaintiff says this prevails if it is left an open question. Under the charter-party then it was between these parties an open question, and it was closed only by the acquiescence of the captain in the demand of the plaintiff. If the settlement had been according to the terms of the charter-party, it would by implication have included the allowance made necessary by the custom of Liverpool and allowed in Charleston. Of this the defendants are deprived by the act of the master, he thus altering the contract in a substantial term, but with no more authority than he had to diminish the amount of the fixed sum stipulated in the charter-party; and what he could not do directly he could not do indirectly.

It was not error to instruct the jury that " it is not duress on the part of a person to insist on his legal rights," and the exception to the charge in that respect was not well taken. But we think the defendants were entitled to the further instruction asked for by their counsel. The master of the vessel testified — and I do not find his evidence contradicted — that after the vessel was laden and in the stream ready for sea, the plaintiff applied to him to sign the draft and the agreement; that the captain resisted upon the ground that the tare, etc., should be first allowed, as required at the port of delivery, but the plaintiff, as the captain testifies, said he " would not clear the ship from the customs, settle my business or allow me to proceed, without the signature of these papers," and thus the captain says he was " compelled to sign them." The plaintiff was the agent of the owners of the vessel, the shipper

and consignor of the goods. He, and no other person, could get clearance for the vessel at the custom house (U. S. Rev. Stat., § 4200), and that exclusive power, and the refusal to exercise it, was constraint. To make the contract unlawful, it was not necessary that the person of the master should have been arrested, or his goods or vessel seized or libeled. It is enough that the contracts which he then entered into were made to procure the liberation of the vessel, and their execution might well be imputed to illegal restraint. The learned court should therefore have charged as requested by the defendants' counsel, that if "the jury believed the testimony given by the captain as to the circumstances under which the bills were executed, and that there was no way for him to leave the port with the vessel or cargo without the consent of the plaintiff, the refusal of the plaintiff to allow the vessel to leave the port until the bill was signed did constitute duress." The confinement, by reason of the plaintiff's refusal to do the thing which should clear or let go the vessel, was as coercive and difficult to resist as an actual seizure or imprisonment would have been, and under the construction given by us to the charter-party, the refusal was unlawful, for it was an omission of duty. The principle upon which *Harmony* v. *Bingham* (12 N. Y. 99) and the much later case of *Scholey* v. *Mumford* (60 N. Y. 498) were decided is equally applicable here.

The judgment appealed from should be reversed and a new trial granted, with costs to abide the event.

All concur, except EARL, J., not voting.

Judgment reversed.